**FILED**

Lucinda B. Rauback, Clerk     7
**United States Bankruptcy Court**
**Augusta, Georgia**
*By jpayton at 4:54 pm, Mar 27, 2013*

IN THE UNITED STATES BANKRUPTCY COURT

FOR THE

SOUTHERN DISTRICT OF GEORGIA
Dublin Division

| | | |
|---|---|---|
| IN RE: | ) | Chapter 11 Case |
| | ) | Number 12-30113 |
| SARALAND, LLLP | ) | |
| | ) | |
| Debtor | ) | |
| | ) | |

## OPINION AND ORDER

Before the Court is a Motion for Relief filed by AgGeorgia Farm Credit, ACA. ("AgGeorgia"). This is a core proceeding pursuant to 28 U.S.C. §157(b)(2)(G) and the Court has jurisdiction pursuant to 28 U.S.C. §1334. For the following reasons, AgGeorgia's motion is granted.

## FINDINGS OF FACT

Saraland, LLLP ("Saraland" or "Debtor") is a family partnership and is owned 100% by Mr. Lister Harrell ("Harrell"). Saraland's main asset consists of 5,000 acres of timberland and farmland. Debtor also owns some commercial real estate located in Eastman, Georgia which is not part of AgGeorgia's collateral. Debtor has acquired the acreage over a number of years.

The 5,000 acres is a mixed use farm, approximately 1,700 of the 5,000 acres is AgGeorgia's collateral and is comprised of the following tracts:  Jones Tract (229.63 acres); Pruett Tract (367.5

acres); McCranie (246.23 acres); and the Lake Tract (853 acres). The Lake Tract is comprised of several tracts – the 404 Tract a/k/a the Smith Tract, the Harrell Tract, Simons Tract 1 and Simons Tract 2.

Debtor currently derives the majority of its income from: leasing commercial land for $36,000.00 per year; leasing approximately 100 acres to a farmer for $10,000.00 per year; leasing the 5,000 acres to five different hunting clubs during deer season for $50,000.00 per year; and leasing land for pine straw harvesting for $45,000.00 per year. These various sources generate income of approximately $141,000.00 per year.

Approximately 4,000 acres of the 5,000 acres is currently used for the growing and selling of timber. Dckt. No. 94, Tr. Hr'g October 23, 2102, p. 66-67, 72. Mr. Harrell testified that the decline in timber prices as well as the expenses of an ongoing lake permitting dispute with the environmental authorities led to Debtor's bankruptcy. Debtor filed its chapter 11 bankruptcy petition on March 29, 2012.[1] Dckt. No. 1. The exclusivity period expired on July 27, 2012. To date, no plan has been filed.

---

[1] On that same date, Mr. Harrell filed his own personal chapter 11 bankruptcy case, Chapter 11 Case Number 12-30112 and he also filed a bankruptcy petition for another one of his corporations, Paradise Farms, Inc., Chapter 11 Case Number 12-30111.

2

AgGeorgia, Bank of Eastman, and Colony Bank are Debtor's secured lenders with combined secured debt of approximately $5.2 million.[2] Dckt. No. 1, Sch. D. Each secured lender holds a first lien on separate acreage within the 5,000 acres. AgGeorgia's lien is secured by 1,700 acres and according to AgGeorgia's proof of claim, Debtor is indebted to AgGeorgia in the amount of $3,357,117.00. Claim No. 3. Debtor does not dispute the amount of the debt and concedes there is no equity in AgGeorgia's collateral. Dckt. No. 94, Tr. Hr'g October 23, 2012, pp. 3 and 222.

At the hearing held on the motion for relief, Mr. Harrell testified one must consider the 5,000 acres in its totality as a one-unit operational farm. Dckt. No. 94, Tr. Hr'g October 23, 2012, pp. 132-33. However, this is not how Debtor financed the farm, as each lender holds different collateral to secure their respective loans and there are no inter-creditor agreements or cross-collateralization.

In an effort to reorganize, Debtor initially plans to: cut its merchantable timber in a responsible fashion; to convert approximately 1,000-1,500 acres of timberland into cropland in various stages; to increase the acreage used in pine straw harvesting to 3,000 acres; to continue leasing land for hunting and

---

[2] All of the numbers referenced in this opinion are rounded.

3

residential purposes; to sell the property in Eastman in an effort to reduce the Bank of Eastman's debt. Currently, approximately 4,000 acres is timberland. Dckt. No. 94, Tr. Hr'g October 23, 2012, pp. 66-67, 72. Debtor also is researching many other possible options such as: stocking ponds for recreational fishing; ecotourism opportunities; and implementing silvopasture management.[3] Dckt. No. 94, Tr. Hr'g October 23, 2012, pp. 72-74. This conversion process is projected to take 3 to 5 years. Dckt. No. 94, Tr. Hr'g October 23, 2012, p. 73. Mr. Harrell proposes that at the end of the conversion process Debtor will be making approximately $746,000.00/year income. Dckt. No. 94, Tr. Hr'g October 23, 2012, p. 94.

Debtor proposes to fund the costs to convert the land through timber sales. Dckt. No. 94, Tr. Hr'g October 23, 2012, pp. 89 and 90. At the hearing, Mr. Harrell's projections also include restructuring the debt to make interest-only payments to its secured lenders for the first 2 or 3 years while amortizing the debt over 18 years at an interest rate of approximately 3.25%-4% interest. Dckt. No. 94, Tr. Hr'g October 23, 2012, p. 96-97. Amortizing $5.2 million secured claims over 18 years with an interest rate of 4%,

---

[3] Silvopasture management combines timber, livestock and forage production on the same piece of land.

4

results in annual payments for the interest only period of $208,000.00. Dckt. No. 94, Tr. Hr'g October 23, 2012, p. 97. According to Mr. Harrell, the annual principal and interest after the three years would be $411,000.00/year.[4] Dckt. No. 94, Tr. Hr'g October 23, 2012, p. 97.

At the hearing, Debtor called three witnesses besides Mr. Harrell to testify. First, Mr. Browning, owner of Browning Straw Company testified that he currently pays Debtor about $90.00/acre to rake the pine straw. Debtor will receive approximately $45,000.00 from Mr. Browning in 2013 for harvesting pine straw on approximately 500 acres. Dckt. No. 94, Tr. Hr'g October 23, 2012, p. 19. This sum is paid between February and April and allows Browning to harvest the rakeable pine straw. Id. at p. 18. Not all of Debtor's timberland is available for pine straw harvesting as the trees are in different stages of growth, thinning, and some areas are under a conservation reserve program ("CRP") until 2013 or 2014.[5] Dckt. No. 94, Tr. Hr'g October 23, 2012, p. 19-20. Furthermore, Mr. Browning testified it takes a year or two to clean the undergrowth and brush

---

[4] However, the annual principal and interest payments on a $5.2 million loan after 2 or 3 years of interest only payments would be approximately $440,542.00 and $461,565.00, respectively.

[5] It is unclear whether the CRP leases expire in 2013 or 2014. Dckt. No. 94, Tr. Hr'g October 23, 2012, p. 124. In addition, Debtor may recommit the property to the CRP.

AO 72A
(Rev. 8/82)

necessary to harvest pine straw. Mr. Browning anticipates continuing to harvest pine straw from Debtor's land. According to Mr. Browning's testimony, he has sprayed approximately 300 more acres for future harvesting. Dckt. No. 94, Tr. Hr'g October 23, 2012, p. 21. Mr. Harrell estimates Browning has actually sprayed closer to 500 more acres for future harvesting. Dckt. No. 94, Tr. Hr'g October 23, 2012, p. 73. Mr. Browning did not know how much pine straw he collects from the 1,700 acres securing AgGeorgia's loan. Dckt. No. 94, Tr. Hr'g October 23, 2012, p. 26. He also said the price may rise in the future; however, he testified there are many variations on the price and he does not anticipate paying more than $90.00-$100.00/acre. Dckt. No. 94, Tr. Hr'g October 23, 2012, pp. 23-24. For example, Longleaf pine needles cost more to harvest than Loblolly pine needles. Furthermore, Mr. Browning testified that his arrangement with Debtor through the end of 2013 is to pay $45,000.00, of which $10,000.00 he has already pre-paid. Dckt. No. 94, Tr. Hr'g October 23, 2012, p. 24.

Next, Mr. Stapleton, a local farmer, testified he may be willing to lease the 200 acres of Debtor's current farmland if the pricing and irrigation details can be worked out. Dckt. No. 94, Tr. Hr'g October 23, 2012, p. 32. He testified he would eventually like to lease up to 1,000 acres. Dckt. No. 94, Tr. Hr'g October 23,

6

2012, p. 34.   He testified the local price for irrigated farmland with the landowner providing the pivots is $200.00/acre-$250.00/acre annually.   Dckt. No. 94, Tr. Hr'g October 23, 2012, p. 32.   Mr. Stapleton testified that farmers growing row crops such as cotton, corn and peanuts generally pay $200.00/acre for irrigated land; and pay $250.00/acre for vegetable crops, such as watermelons.   Dckt. No. 94, Tr. Hr'g October 23, 2012, pp. 38-39. He further testified that non-irrigated local farmland rents for $80.00-$100.00/acre. Dckt. No. 94, Tr. Hr'g October 23, 2012, p. 32.

Irrigating a field requires both a water source, such as a well, and a mode for distribution, such as pivots. Dckt. No. 94, Tr. Hr'g October 23, 2012, pp. 39-40. Debtor's current farming tenant, Mr. Larry Sanders, pays $100.00/acre for irrigated land with Debtor providing the water source from a well located on the property and the tenant providing the pivots to distribute the water. Dckt. No. 94, Tr. Hr'g October 23, 2012, pp. 109-110.

Mr. Stapleton also testified as to costs he has incurred in converting timberland to farmland.   It has been his experience that it costs $500.00/acre to have the stumps removed and $500.00-$600.00/acre for clearing. He estimated the total cost to remove stumps, clear and install the water source and distribution system to be approximately $1,500.00-$2,000.00/acre.   Dckt. No. 94, Tr.

7

Hr'g October 23, 2012, pp. 39-40.  However, he admitted he was not real sure about the specific costs associated with obtaining the pivots.  Id.

Debtor called Mr. Sutton of Middle Georgia Road Builders. Customarily, Mr. Sutton does land clearing jobs on a per acre basis and the general price for clearing to convert timberland into farmland is $800.00-$1,200/per acre.  Dckt. No. 94, Tr. Hr'g October 23, 2012, pp. 48-49.  He testified each job presents its own unique difficulties and has to be priced accordingly.  For example, mature trees have extensive root systems which increases clearing costs. He recently cleared some land for Debtor on a per hour basis.  Dckt. No. 94, Tr. Hr'g October 23, 2012, p. 50.  Dckt. No. 94, Tr. Hr'g October 23, 2012, p. 52.  The hourly rate varied based upon the type of equipment utilized.  Dckt. No. 94, Tr. Hr'g October 23, 2012, Debtor's Ex. No. 2; Dckt. No. 94, Tr. Hr'g October 23, 2012, p. 50. Mr. Sutton estimated his total hourly rate translated into approximately $750.00/acre, but this rate is not exact because it is for converting 124 acres; however, the work to convert 24 of the 124 acres is incomplete.  Dckt. No. 94, Tr. Hr'g October 23, 2012, pp. 54 and 60.  Of the 124 acres, Mr. Sutton is working on, 100 acres is farm ready, but the 24 acre portion of the job is only half-way done, with 3-4 days of work remaining.  Dckt. No. 94, Tr. Hr'g

8

October 23, 2012, p. 60. He stated that if it were on a flat rate price he would have quoted $1,000.00/acre for clearing the land because of the uncertainty of what he would find once the work began. Dckt. No. 94, Tr. Hr'g October 23, 2012, p. 58. By doing the work by the hour, Mr. Sutton said clients generally pay less for the services. Mr. Sutton said he is willing to continue working for Debtor on an hourly basis. Dckt. No. 94, Tr. Hr'g October 23, 2012, p. 56.

AgGeorgia called two witnesses in its case in chief. First, AgGeorgia called Mr. Morree who also clears land. Mr. Morree assessed two tracts of Debtor's land securing AgGeorgia's lien, the Pruett tract and the McCranie tract. He estimates the cost to convert these tracts to farmland would be approximately $1,175.00/acre for the Pruett Tract and $2,025.00-$2,100.00/acre for the McCranie Tract. Dckt. No. 94, Tr. Hr'g October 23, 2012, Pls.'s Ex. No. 3. Both Morree and Sutton agreed as to the general steps necessary to convert the timberland to farmland. Furthermore, neither of their estimates include providing the water source or irrigation system. Id.

AgGeorgia also called Mr. Graham, as its expert real

9

estate appraiser.[6]  He testified to the value of each of the four tracts comprising AgGeorgia's collateral, the Jones, Pruett, McCranie and Lake Tracts.  While the parties concede there is no equity in the property securing AgGeorgia's loan, a discussion of the acreage and its usage is important to the analysis currently before the Court.  Furthermore, Mr. Graham also provided testimony on the local timber values, rental rates and expenses of readying and converting timberland into farmland.  According to Mr. Graham, the total amount of merchantable timber on AgGeorgia's collateral is approximately $414,913.00.  Dckt. No. 94, Tr. Hr'g October 23, 2012, Pl.'s Ex. Nos. 4-7.

As way of overview, the Jones Tract, consists of 229.63 acres which includes: 94.02 acres of existing cropland, consisting of 90 acres which is irrigated farmland and 4.02 acres which is dry farmland; and 92.73 of timberland.  The oldest pines on this tract were planted in 1997.  Some pines were planted in 1998 and 2001.  He valued the merchantable timber at approximately $44,000.00.  Tr. Hr'g Oct. 23, 2012, p. 181, Pl.'s Ex. No. 4.

The next tract securing AgGeorgia's loan is the 367.50

---

[6] Mr. Graham was admitted as an expert for the purposes of appraising real property without objection by Debtor. Dckt. No. 94, Tr. Hr'g October 23, 2012, p. 169.

10

acre Pruett tract which consists of: 22.37 woodlands; and 345.13 acres of four year-old pines. Currently, there is no merchantable timber on the Pruett tract, and the non-merchantable timber value is included in the land valuation for this tract, and the other tracts. Dckt. No. 94, Tr. Hr'g October 23, 2012, p. 198-99, Pl.'s Ex. No. 5.

The McCranie Tract also secures AgGeorgia's loan and is approximately 246.23 acres --101.74 acres of plantation pine timber; and 115.97 acres of 14 year-old pines; the remainder of the tract is hardwood and pine and stream management zones. The value of the merchantable timber on this tract is $125,113.00. Dckt. No. 94, Tr. Hr'g October 23, 2012, p. 186, Pl.'s Ex. No. 5.

The fourth and final tract securing AgGeorgia's loan is designated as the Lake Tract and consists of 853.00 acres. AgGeorgia's appraisal on this tract is limited to 677.02 acres because of successor liability concerns over Debtor's and Mr. Harrell's ongoing dispute with the environmental authorities over permitting issues. Dckt. No. 94, Tr. Hr'g October 23, 2012, p. 188. The total amount of merchantable timber on AgGeorgia's Lake Tract is $245,800.00. Dckt. No. 94, Tr. Hr'g October 23, 2012, p. 191, Pl.'s Ex. No. 7. While not a valuation hearing or ruling, AgGeorgia values its total collateral at approximately $2.2 million and the debt at approximately $3.4 million.

AO 72A
(Rev. 8/82)

Mr. Harrell testified in general terms that he had looked at the projected revenue and he anticipates the income generated from timber harvesting to be sufficient to service all the debt. He testified:

> ["On the McCranie Tract,] [i]t's probably a quarter of a million dollars' worth of timber right there that needs cutting,[7] and every stand that it is not thinned, that's golly, well, almost 3,000 acres. The only stands that we have in that 3,000 projection that's too young to thin would be these two areas over in [the Pruett tract which is the sixth area scheduled to be converted to irrigated farmland] and the [two Simons tracts currently the fourth and fifth areas scheduled to be converted to irrigated farmland]. [Those areas are] just pre-merchant and wouldn't be merchantable; and depending on the market. I mean, you'd have to do it as you went.
>
> I mean, for instance, we've got a target price of $1,500 an acre. If the market hits and we've able to cut our Loblolly Pine out at 100 tons at $15 a ton, we're going to take it and clear-cut. That's just kind of our strike price, you know. That's going to be a plan changer. . . . So to answer your question, there is sufficient timber at today's prices to do what we want to do.

Dckt. No. 94, Tr. Hr'g October 23, 2012, p. 90.

Debtor estimates that 3,000 acres is available for timber sales; however, he later states that not all of the timber is merchantable timber. But for AgGeorgia's appraisal and Mr. Harrell's

---

[7] This is $124,887.00 more than Mr. Graham's appraisal.

12

general testimony there is no evidence of the value of the timber on the property.

At the hearing, Mr. Harrell also testified that he plans to convert seven areas of timberland into irrigated fields for crops. The conversion would be staggered over 3-5 years and the fields would be converted roughly in numerical order. Dckt. No. 94, Tr. Hr'g October 23, 2012, p. 73-75. Mr. Harrell tendered into evidence a third party estimate of the cost of providing a water source and irrigation: (1) Field 6(Pruett tract) - $365,000.00; (2) Field 1, 2 and 3 (includes the Harrell tract) – $291,000.00; and (3) Field 7 (McCranie) – $606,680,00, for a total cost of $1,262,680.00. Dckt. No. 94, Tr. Hr'g October 23, 2012, Debtor's Ex. No. 6.

### CONCLUSIONS OF LAW

AgGeorgia argues its motion for relief should be granted because Debtor has failed to establish that AgGeorgia's collateral is necessary for Debtor's effective reorganization as required by the 11 U.S.C. §362(d)(2). Conversely, Debtor argues the collateral is necessary for its effective reorganization as Debtor needs all of its land for its successful reorganization. For the reasons discussed below relief is granted to AgGeorgia pursuant to 11 U.S.C. §362(d)(2).

To grant a motion for relief from stay under §362(d)(2) the Court must find that there is no equity in the property and that

13

the property is not necessary to an effective reorganization. 11 U.S.C. §362(d)(2). Since the parties have stipulated that there is no equity, the issue is whether the property is necessary for an effective reorganization.

In order to establish that the property is necessary for an effective reorganization, the burden is on Debtor to show "'a reasonable possibility of a successful reorganization within a reasonable time.'" <u>United Sav. Ass'n of Texas v. Timbers of Inwood Forest Assoc.</u>, 484 U.S. 365, 376 (1988); 11 U.S.C. §362(g). "What this requires is not merely a showing that if there is conceivably to be an effective reorganization, this property will be needed for it; but that the property is essential for an effective reorganization that is in prospect." <u>Id.</u> at 375-76; <u>see</u> <u>Bowman v. Bond (In re Bowman)</u>, 253 B.R. 233, 239 (B.A.P. 8th Cir. 2000)(granting relief from stay and rejecting debtor's argument that seven months is insufficient time [to propose a plan] and stating, "sincerity, honesty, and willingness are not sufficient to make the plan feasible"). Debtor must demonstrate that "an effective reorganization is realistically possible; the mere fact that property is indispensable to the debtor's survival is insufficient." <u>Albany Partners, Ltd. v. Westbrook (In re Albany Partners, Ltd.)</u>, 749 F.2d 670, 673, n. 7 (11th Cir. 1984).

14

In this case, Debtor has failed to carry its burden to establish that there is a reasonable possibility of a successful reorganization within a reasonable time.  While this is not a confirmation hearing, Debtor still has to satisfy the burden under §362(d) and Debtor has failed to present sufficient calculations with understandable projections to carry its burden.

Debtor treats the 5,000 acres as a whole, but obtained separate financing.  The respective secured lenders hold first liens on separate tracts and do not hold subordinated positions on the remaining acreage.  There are no inter-creditor loan agreements.  There has been no showing that AgGeorgia's tract is "necessary" or "logically required" to the success of Debtor's reorganization.  See In re Brampton Plantation, LLC, 2011 WL 7268055, *5 (Bankr. S.D. Ga. Dec. 6, 2011)("necessary" as used in §362(d)(2) means "logically required");  In re Simmons, 446 B.R. 646 (Bankr. S.D. Ga. 2010)(noting that the property needs to be "logically required" to make the plan work).  There has been no showing how AgGeorgia's collateral is necessary for the success of Debtor's reorganization. Mr. Harrell testified that the Court must consider the farm as whole, but failed to provide the necessary projections to allow the Court to analyze the issue.  He provided general, vague and sometimes inconsistent proposals.  Furthermore, while it is totally

15

understandable why Mr. Harrell would present high expectations, evidence presented did not sufficiently support his expectations to establish that there is a reasonable possibility of a successful reorganization within a reasonable time.

In addition, even if AgGeorgia's collateral is necessary for Debtor to reorganize, Debtor has not shown there is a plan that can be confirmed within a reasonable period of time. See In re Brampton Plantation, LLC, 2012 WL 707062 *9 (S.D. Ga. March 5, 2012)(the debtor failed to show that the property "is essential for an effective reorganization *that is in prospect*.") citing Timbers of Inwood Forest Assocs., Ltd., 484 U.S. at 376 (1988)(emphasis in original). At the time of the hearing, this bankruptcy case had been pending for seven months, and no plan has been filed to date. The exclusivity period expired on July 27, 2012, three months prior to the hearing and so Debtor's burden is not as lenient as it is early in a bankruptcy case. See Am. Network Leasing, Inc. v. Apex Pharm., Inc. (In re Apex Pharm., Inc.), 203 B.R. 432, 441-42 (N.D. Ind. 1996)(courts are not as lenient after the debtor's exclusivity period has ended as the purpose for the leniency, to give a debtor sufficient time to propose a plan, is no longer applicable); see also In re Holly's, Inc., 140 B.R. 643, 700, n. 90 (Bankr. W.D. Mich. 1992)(noting how the burden of proof is easier to satisfy at

16

the early stages of a case, but as time passes the burden of proof becomes greater and more difficult to meet).

Debtor's overall plan is: to ultimately have 3,000 acres available for pine straw harvesting to generate income of $90.00-$100.00/acre or $300,000.00 a year; to increase the  hunting leases rental rates from $10.00/acre to $15.00/acre to generate approximately $80,000.00/year in income; to convert approximately 1,000-1,500 acres of timberland into irrigated cropland with a water distribution system sufficient to generate income of $250.00/acre or $250,000.00-$375,000.00/year; and maintain residential leases for $36,000.00/year.  Debtor anticipates that the conversion will take 3 to 5 years.

### Pine Straw Harvesting

Mr. Harrell testified that there will be 1,300 - 1,800 acres from which pine straw may be harvested in 2013, resulting in $130,000.00 - $180,000.00 of income. Mr. Harrell's acreage includes the 500 acres currently in production; 500 acres of Longleaf pine that is currently in the conservation reserve program which expires either in 2013 or 2014; 300 acres that Mr. Browning has previously sprayed; 200 additional acres that Mr. Harrell says Mr. Browning

17

actually sprayed;[8] and 200-300 acres Mr. Harrell testified that he has readied.   Mr. Harrell testified that the Longleaf needles are premium and should merit a higher return.   However, Mr. Browning testified Longleaf also was more expensive to harvest and he did not anticipate paying more rent.   Mr. Harrell acknowledges Georgia's pine straw market is not as profitable as in other states, but, he hopes the price will increase.  Dckt. No. 94, Tr. H'rg October 23, 2012, pp. 72-73.   In addition, the needles in the conservation program cannot be harvested before the expiration of the easement which is either in 2013 or 2014.[9]  At the time of the hearing, pine straw was only being harvested from about 500 acres and Debtor was receiving $90.00/acre.  Mr. Browning testified that the land must be prepared which can take 1 to 2 years before pine straw can be harvested and that he will pay $45,000.00 in 2013 for the pine straw.

There also was insufficient evidence as to whether all 3,000 acres will be ready to be harvested in 3 to 5 years or whether harvesters would be ready, willing and able to harvest the pine

---

[8] Mr. Harrell testified that Mr. Browning's calculations were short by approximately 200 acres.

[9] As previously stated, the record is unclear on when the CRP programs expire.   See footnote 5 supra.

AO 72A
(Rev. 8/82)

straw on that many acres at that rate.  Also, the effects if any, of the timber harvest and conversion from timberland to farmland on pine straw harvesting is not clear.

## Hunting Leases

Mr. Harrell also proposes to raise the hunting lease rates from $10.00/acres to $15.00/acre and says the pine straw harvesting does not interfere with the leases.  Debtor projects its annual income with an upward adjustment for those leases with houses would increase from $50,000.00 to $80,000.00.  Debtor did not address whether there will be any adjustment in the hunting leases for the conversion of the 1,000-1,500 acres to irrigated cropland.

## Conversion to Farmland

As to conversion of the 1,000-1,500 acres to farmland, the current tenant leases 100 acres at $100.00/acre.  Debtor provides the well and the tenant provides the pivots.  Debtor's prospective tenant, Mr. Stapleton testified that land where the owner provides the water source and pivots rents for $200.00-$250.00/acre.  Without water, Mr. Stapleton said the rental rate is $80.00-$100.00/acre. Where the landowner provides the water source, but the farmer provides the pivots, the rental rate is $100.00/acre.  This is consistent with Debtor's current tenant.  AgGeorgia's witness testified to local rental rates of $125.00-$200.00/acre for land

19

where the water source and pivots are provided by the landowner, $75.00/acre for irrigated land, where the tenant provides the pivots; and $25.00-$45.00/acre for dry land. After considering the testimony, I found the testimony of Mr. Stapleton to be the most reliable. He is a local farmer and knowledgeable about the current going rate of such land. Furthermore, this rate is consistent with the rate being paid by the current tenant.

Debtor projects leasing 1,500 acres for $250.00/acre will generate $375,000.00/year. This anticipates Debtor providing both the water source and pivots, and receiving the highest projected rental rate. According to Debtor's estimates, the cost for just providing the water source and pivots under its conversion proposal would total $1,262,680.00. Dckt. No. 94, Tr. H'rg October 23, 2012, Ex. No. 6. Using Debtor's projections, it would take more than 3 years to recoup this cost from the farmland rental income, and this does not include any cost for land clearing. Mr. Harrell talked about doing the work in stages but gave no projections from which the Court could conclude there is a reasonable possibility of a successful reorganization within in a reasonable period of time.

Debtor's conversion proposal also raises feasibility concerns. Before the first additional farmland rental dollar is paid to Debtor, the land must be cleared. Mr. Stapleton testified

20

this cost runs from $1,000.00/acre to $1,500.00/acre.  Mr. Sutton testified that each project is unique but his prices generally ranged from $800.00-$1,250.00/acre.  He testified his average clearing cost would be $1,000.00/acre.  Mr. Sutton has done such clearing work for Mr. Harrell on an hourly basis, which he calculated resulted in about a $750.00/acre rate.  After considering the evidence, I have not strictly applied this hourly rate of $750.00 because it includes work for 24 acres that is only halfway complete.  Dckt. No. 94, Tr. Hr'g Oct. 23, 2012, p. 54.  In addition, as Mr. Morree and Mr. Sutton confirmed, the pricing and hours involved are site specific.  Mr. Morree estimated clearing an easy site, such as the Pruett Tract, would cost about $900.00/acre. A more difficult site such as the McCranie Tract would cost $2,025.00-$2.096.00/acre.  Dckt. No. 94, Tr. Hr'g Oct. 23, 2012, Pl.'s Ex. No. 3.  Given the varying nature of the property and the testimony, I find it will cost an average of $1,000.00/acre to clear the land.

Debtor proposes to use the proceeds from timber sales to finance the conversion process.  However, Debtor has failed to provide sufficient data to analyze this proposal.  While this is not a plan confirmation analysis, Debtor has the burden of proof of establishing a reasonable possibility of a successful reorganization

21

within a reasonable period of time. <u>Timbers</u>, 484 U.S. at 376; 11 U.S.C. §362(d). It is not realistic to propose to cut this timber, taking the creditor's ready cash, and putting it back into the collateral that had no equity to start with and propose to pay the creditor interest only for three to five years, all in the hopes that Debtor can lease the land to generate a positive cash flow to ultimately pay secured creditors in full over an 18 to 20 year period.

Furthermore, Debtor has not put forth any cash flow projections analyzing the revenue versus the costs. There are no "break-even" projections. These projections do not have to be sophisticated but Debtor has the burden to provide adequate information to establish that a there is reasonable possibility of a reorganization within a reasonable period of time, and Debtor has failed to provide such information. The Court cannot ferret out this information and cannot rely on speculation. <u>See</u> <u>In re Global Ship Sys., LLC.</u>, 391 B.R. 193, 208 (Bankr. S.D. Ga. 2007)("[a] reasonable probability cannot be grounded solely on speculation. . . and a 'mere financial pipe dream' is insufficient to meet the requirements of §362(d)(2)") <u>citing</u> <u>In re 6200 Ridge, Inc.</u>, 69 B.R. 837, 843 (Bankr. E.D. Pa. 1987) (citations omitted); <u>see also</u> <u>In re Anderson Oaks (Phase I) Ltd. P'ship</u>, 77 B.R. 108, 110 (Bankr. W.D.

22

Tex. 1987) ("[t]he court should not, at the conclusion of the debtor's case, be left to speculate about important elements and issues relating to the likelihood of an effective reorganization.").

Conclusion

While this is not confirmation, the burden is on Debtor to establish that a plan is in prospect. See In re Brampton Plantation, LLC, 2012 WL 707062 at *9(the debtor failed to show that the property "is essential for an effective reorganization that is in prospect."). Abstract proposals and ideas no matter how sincere are insufficient to meet this burden of proof. In re Bowman, 253 B.R. at 239 (granting relief from stay and rejecting debtor's argument that seven months is insufficient time [to propose a plan] and stating, "sincerity, honesty, and willingness are not sufficient to make the plan feasible").

Debtor's proposal also presents feasibility concerns because it may involve cutting timber from one secured creditor's collateral to pay for the conversion of another creditor's collateral. Mr. Harrell stated he would segregate the revenue from the timber sales from each creditor's tract, but he did not provide any projections for this analysis. Mr. Harrell also acknowledged it would be a challenge to segregate and say this timber came off AgGeorgia's collateral so it has to be used for improving

23

AgGeorgia's collateral.  Tr. Hr'g Oct. 23, 2012, p. 122.

In _In re Del-a-Rae, Inc._, 447 B.R. 915 (Bankr. S.D. Ga. 2011), the debtor had filed a proposed plan which contemplated debtor keeping property while making adequate protection payments to one secured creditor from the equity cushion in another lender's collateral by the cutting of timber from that tract.  _In re Del-a-Rae, Inc._, 447 B.R. at 919-920.  The bankruptcy court granted relief from the stay where the property at issue had no equity and Debtor had not shown the property was necessary for an effective reorganization where debtor was hoping the market would rebound in five years and provide an increase in the value of the property thus creating enough equity to pay unsecured creditors a dividend; however, the court found the property was a financial drain on the debtor.  _Id._ at 921.

Debtor argues _In re Del-a-Rae, Inc._ is distinguishable in that the _Del-a-Rae_ debtor was proposing to cut the timber to pay the creditor and there was no plan for the property to produce other income.  Conversely, in the current case, Debtor indicates it has a plan to generate other sources of income from the property. However, this projected income comes at a great cost over several years and Debtor has failed to put forth sufficient evidence to be able to analyze whether there is a reasonable possibility of a successful reorganization within a reasonable time.  Mr. Harrell

24

acknowledges without the timber sales, there is insufficient working capital to convert the land as contemplated and it is clear Debtor has not worked these issues out with its secured lenders. There is no equity to provide AgGeorgia adequate protection.

Debtor also has problems with how it proposes to pay its secured creditors during the conversion process. Using Mr. Harrell's suggestion of amortizing $5.2 million dollars over 18 years at 4% interest per annum, with interest only payments in the first 3 years, Debtor's payments would be approximately $17,333.00/month for the first 3 years and $38,464.00/month for the next 15 years. Debtor's attorney acknowledges there may be a confirmability issue with the proposed 4% interest rate failing to satisfy the requirements set forth by the Supreme Court's _Till_ case. See _Till v. SCS Credit Corp._, 541 U.S. 465 (2004)(holding that in a chapter 13 plan cram down, a formula approach of prime national interest rate based on risk of nonpayment was the appropriate interest rate). Notwithstanding the _Till_ issue, Debtor's proposal to amortize this debt over 18 years with 3 years of interest only payments where there is no equity cushion with no real projections

25

or supporting documentation fails to satisfy the reasonable possibility of a successful reorganization within a reasonable time. See In re Immenhausen, 172 B.R. 343, 348 (Bankr. M.D. Fla. 1994)(plan that called for interest-only payments for first few years with balloon payment at end of 5 years not confirmable where property had no equity and debtor did not have adequate cash flow).

In another case, relief from stay was granted where the property did not generate sufficient rental income to pay the debt which encumbered it. See In re Simmons, 446 B.R. 646 (Bankr. S.D. Ga. 2010). Debtor also has failed to show how AgGeorgia's property is necessary for an effective reorganization that is in prospect. Like the property in In re Del-a-Rae, Inc. and In re Simmons, AgGeorgia's collateral has no equity and according to Mr. Harrell it will possibly be at least five years before Debtor's proposed conversion of the timberland into farmland is complete. Dckt. No. 94, Tr. Hr'g Oct. 23, 2012, p. 73. AgGeorgia's collateral has not produced enough income to service the debt that encumbers it. Taking property worth approximately $2.2 million that secures outstanding indebtedness of more than $3.3 million and removing the merchantable timber, incurring conversion costs to reap an indeterminable amount and rate of income from the collateral does not establish that a plan can be proposed with a "reasonable

26

possibility of a successful reorganization within a reasonable time." <u>Timbers</u>, 484 U.S. at 376.

      For these reasons, the Court finds Debtor has failed to satisfy its burden under 11 U.S.C. §362(d)(2) and (g). After almost twelve months with no plan filed, given the evidence in this case, the Court cannot conclude Debtor has "a reasonable possibility of a successful reorganization within a reasonable time." <u>Timbers</u>, 484 U.S. at 376. For the foregoing reasons, AgGeorgia's Motion for Relief from the Stay is ORDERED GRANTED.

_Susan D. Barrett_

SUSAN D. BARRETT
CHIEF UNITED STATES BANKRUPTCY JUDGE

Dated at Augusta, Georgia
this 27th day of March, 2013.

27